PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SILVIA GARCIA,<br><br>       Plaintiff,<br><br>       v.<br><br>ANSHUTZ ENTERTAINMENT GROUP, INC., a Colorado corporation, d/b/a WWW.SHRINEAUDITORIUM.COM,<br><br>       Defendant. | Case No.:  5:25-cv-02282-SSS-DTB<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Silvia Garcia ("Plaintiff") alleges as follows:

### I.    INTRODUCTION

1.    This First Amended Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law.  When consumers visit the commercial website of https://www.shrineauditorium.com/ (the "Website"), which is owned and operated by Defendant Anschutz Entertainment Group, Inc. ("Defendant"), Defendant enables several third parties – including registered data broker, Magnite Inc. ("Magnite"), as well as other entities (collectively, the "Third Parties") – to track users' website browsing activities and eavesdrop on users' private communications on the Website via either pixels or third-party cookies stored on user

devices from which they transmit information to third party servers. When consumers visit the Website, Defendant displays to them a pop-up cookie consent banner containing a consent management platform ("CMP") on the homepage. Although Defendant's cookie banner discloses that the Website uses cookies, such banner expressly purports to give users the option to control how they are tracked and how their personal data is used. In particular, Defendant assures visitors that they can choose to "Reject All" cookies by clicking the "Reject All" button within such cookie banner. Defendant's promise is designed to lull users into a false sense of security.

2.      Notwithstanding the foregoing assurances, third party cookies are downloaded onto the user's Internet browser *immediately* upon loading of the Website onto the user's browser, which means that such cookies are operational *even before a user has a reasonable opportunity to read the cookie banner and make privacy-related selections from such cookie banner*.

3.      In addition, those third party cookies are not removed from the user's browser even if a user clicks the "Reject All" button from the cookie banner, which has broad ramifications on the user's privacy. The fact that such third party cookies are not removed from the user's browser necessarily means that such third party cookies remain operational as soon as the user visits a different website that makes use of the service provided by such third party cookies on such other website. In other words, even though such third party cookies may not be operational with respect to the user's interactions with the Website itself after the user clicks on the "Reject All" button, such third party cookies are, in fact, operational when the user visits a different website that uses the same third party cookies.

4.      Thus, Plaintiff submits that the cookie banner on the Website is either false or misleading because such cookie banner implies to the user that: (1) by clicking the "Reject All" cookies option, no non-essential cookies were downloaded onto the user's browser and operational before such selection was made; and (2) by clicking the

FIRST AMENDED COMPLAINT

"Reject All" cookies option, no such non-essential cookies downloaded onto the user's browser shall function to track the user's behavior while visiting other websites.

## II.   THE PARTIES

5.   Plaintiff is, and was at all relevant times, an individual and resident of the State of California.  Plaintiff is and was at all times mentioned herein a citizen of the State of California.  Plaintiff intends to remain in California and makes her permanent home there.

6.   Defendant is a Colorado corporation.  Plaintiff is informed and believes and thereon alleges that Defendant is a California-based operator of sports and live entertainment venues that sells tickets to consumers nationwide via the Website and other websites.

## III.   JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

8.   Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

9.   Defendant is an online provider of services that owns and/or operates the Website, which markets, advertises, and sells products and/or services nationwide and in California.  Defendant has substantial contacts with and receives substantial benefits and income from and through the state of California.  Defendant made, and continues to make, offers to consumers or businesses in California.

10.   Defendant engaged in intentional acts by operating its Website and making it available to California residents, advertising its products and services via its Website to California residents, expressly aiming its conduct toward California residents by conducting substantial business with residents of the State of California via its Website, and causing both intangible injuries and economic harm to California residents that Defendant knew would be likely to be suffered in California.

- 3 -

11.    Defendant's Privacy Policy (revised on May 6, 2024) at: https://aegworldwide.com/privacy-policy expressly makes reference to the Website's compliance with California law regarding the online privacy of California consumers. (Doc. 17-3; Page ID #128.)  Thus, Defendant is aware that it has been collecting personal information from California consumers, which is why Defendant's online Privacy Policy literally singled out the Website's purported compliance with the California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civ. Code § 1798.100 *et seq.*, as amended by the California Privacy Rights Act of 2020.

12.    Defendant sells products and/or services to California residents via the Website as part of its regular course of business.  Plaintiff is informed and believes and thereon alleges that Defendant sells thousands of products and/or services each year to California residents via the Website.

13.    Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

14.    Every website including the Website is hosted by a server that sends and receives communications in the form of HTTP requests such as "GET" or "POST" requests to and from Internet users' browsers.  For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server.  The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested).  When the Website server receives an HTTP request, it processes that request and sends back an HTTP response.  The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

- 4 -

FIRST AMENDED COMPLAINT

15.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

16.    Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

17.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies.  Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device.  As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users.  Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

18.    First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Website's servers).  First-party cookies are used to track users when they repeatedly visit the same website.

19.    A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; irxcm.com; clarity.ms, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party

- 5 -

resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

20.     As described further below, the Website has embedded the software code of at least one data broker registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Jan. 21, 2026). Plaintiff is informed and believes and thereon alleges that the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

   • **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

   • **Visit History**: Information about the frequency and total number of visits to the Website;

   • **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;

- 6 -

• **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

• **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website's content;

• **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

• **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

• **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

• **Referring URL**: Information about the Website that referred the user to the Website;

• **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;

• **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and

• **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

21. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and

- 7 -

demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

22.   Defendant owns and operates the Website, which allows visitors to receive information about its products and/or services and to purchase skincare products.  As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

23.   Defendant chose to install or integrate the Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

24.   Defendant's Privacy Policy (with a revision date of May 6, 2024) (the "Privacy Policy") states that Defendant "takes your privacy seriously and we know that you do too."   (Privacy Policy; Doc. 17-3; Page ID#108.)   Such Privacy Policy "describes how [Defendant and its affiliates, subsidiaries, and related companies under the AEG brands] process data relating to identified or identifiable individuals and households ('**Personal Data**')."  (Privacy Policy; Doc. 17-3; Page ID#111) (emphasis in original).

25.   The Privacy Policy states in relevant part:

"We collect Personal Data from various sources, which include:

- 8 -

FIRST AMENDED COMPLAINT

"**Data you provide us-**We receive Personal Data when you provide them to us, when you purchase our products or services, complete a transaction via our Services, *or when you otherwise use our Services*.

**Data we collect automatically-***We collect Personal Data about or generated by any device used to access our Digital Services*, the websites of any ticketing service provider used to purchase a ticket to our Events and Venues, RFID, or when you use WiFi at any of our Events and Venues."

(Privacy Policy; Doc. 17-3; Page ID #112) (first and third emphasis in original; second and fourth emphasis added).  The Privacy Policy defines "Digital Services" to mean:

- Our products, services, or technology in venues and events we own or operate; and
- *Our websites, mobile applications,* social media pages, *and other online services*."

(Privacy Policy; Doc. 17-3; Page ID#109) (emphasis added).

26.    "The categories of Personal Data we process may include:

"**Device / Network Data-***Browsing history, search history, and information regarding your interaction with a website*, application, or advertisement (e.g. *IP Address*, MAC Address, SSIDs, application ID/AdID/IDFA, *session navigation history and similar browsing metadata*, and other data generated through applications and browsers, including cookies and similar technologies and other device identifiers or persistent identifiers), online user ID, device characteristics (such as browser/OS version), web server logs, application logs, first party cookies, *third party cookies*, *web beacons,* clear gifs and *pixel tags*."

(Privacy Policy; Doc. 17-3; Page ID#111) (first emphasis in original; second, third, fourth, fifth, and sixth emphasis added).

FIRST AMENDED COMPLAINT

27. The Privacy Policy states in regards to "Digital Services, "We may process this Personal Data for our **Commercial Purposes** (which may include data sales/sharing)." (Privacy Policy; Doc. 17-3; Page ID#116) (emphasis in original).

28. The Privacy Policy states under the heading, "Cookies and Other Tracking Technologies," in relevant part as follows:

"We and authorized third parties may use cookies and similar technologies for the following purposes:

…

- For 'retargeting,' Targeted Advertising, or other advertising and marketing purposes, including technologies that process Preference Data or other data so that we can deliver, buy, or target advertisements which are more likely to be of interest to you…."

(Privacy Policy; Doc. 17-3; Page ID#117.)

29. The Privacy Policy states under the heading, "Commercial Purposes," and the sub-heading, "Targeted Advertising," in relevant part as follows:

"In some jurisdictions, AEG Companies, and certain third parties operating on or through our Services, may engage in advertising targeted to your interests based on Personal Data that we or those third parties obtain or infer from your activities across non-affiliated websites, applications, or services in order to predict your preferences or interests ('**Targeted Advertising**'). This form of advertising includes various parties and service providers, including third party data controllers, engaged in the processing of Personal Data in connection with advertising. These parties may be able to identify you across sites, devices, and over time.

The parties that control the processing of Personal Data for Targeted Advertising purposes may create or leverage information derived from **Personalization**, **Profiles**, and **Marketing Communications**. In some cases, these parties may

- 10 -

also develop and assess aspects of a Profile about you to determine whether you are a type of person a company wants to advertise to, and determine whether and how ads you see are effective. These third parties may augment your profile with demographic and other Preference Data, and may track whether you view, interact with, or how often you have seen an ad, or whether you purchased advertised goods or services.

We generally use Targeted Advertising for the purpose of marketing our Services and third-party goods and services, and to send marketing communications, including by creating custom marketing audiences on third-party websites or social medial platforms."

(Privacy Policy; Doc. 17-3; Page ID #122) (emphasis in original).

**B.** **Plaintiff's Investigation Has Detected Pixels, Cookies, and Spyware Operating through the Website.**

30. Plaintiff's investigation of the Website has detected cookies, pixels, and spyware operating through the Website.

31. Plaintiff's investigation of the Website has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's non-essential cookies in the cookie banner or CMP and Privacy Policy.

32. The browser's developer tools allows for the inspection of third-party cookies stored on a user's device by a website, which reveals the cookie's name, the domain that set it, its category or purpose, and the platform with which it is associated.

33. Third-party cookies can only be set by the third-party server itself, and not by the website directly. Thus, if a third-party cookie is present, it necessarily means that a tracking script from that third party was loaded and successfully executed on the website at issue.

- 11 -

34.    Once the tracking script runs, it sends user data to the third party's server. In response, the server sets a cookie in the visitor's browser.  This cookie allows the third party to recognize and track the user during future visits even across different websites.

35.    Plaintiff's investigation of the Website by and through a computer expert has detected multiple third party cookie code deployed on a user's browser immediately upon landing on the webpage without user consent.  These third-party identifiers are used for advertising, analytics, and marketing purposes, and represent data collection occurring without consent from the user.

36.    The screenshot image below of the developer tools panel shows on the right-hand side the third party cookies stored on the user's browser without consent:



### 1.    **Magnite**

37.    Magnite is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Feb. 5, 2026).

38.    Magnite tracks a user's ***precise*** geolocation as depicted on the website of the California Privacy Protection Agency depicted in the screenshot image below:



| Business Name (Doing Business As) | Email | Website | Minors | Precise Geolocation | Reproductive Healthcare Data | |
|---|---|---|---|---|---|---|
| Magnite Inc | privacy@magnite.com | https://www.magnite.com | No | Yes | No | View |

39.    A web beacon is sent to Magnite servers to track visitors and synchronize cookie data with external platforms.

40.    A screenshot of the response header showing the data payload is depicted below:



FIRST AMENDED COMPLAINT

41. As depicted above, "put" contains the external user ID, which is used to synchronize data.

42. As depicted above, "next" contains the next URL in the request chain, which syncs data with TheTradeDesk (adsrvr.org).

43. Tracking cookies are stored on the browser, which allows users to be identified and online activity to be tracked for the next 365 days.

| Name | Value | Domain | P... | Expires /... | S |
|------|-------|--------|------|-------------|---|
| audit | 1\|Uxh4JYhoxjsPjwhp+ThHRHx... | .rubiconproject.com | / | 365 days | |
| audit_p | 1\|Uxh4JYhoxjsPjwhp+ThHRHx... | .rubiconproject.com | / | 365 days | |
| khaos | MKMZF8Y0-1Y-4DG7 | .rubiconproject.com | / | 365 days | |
| khaos_p | MKMZF8Y0-1Y-4DG7 | .rubiconproject.com | / | 365 days | |

### 2. **TikTok**

44. The Website monitors visitor activity and sends requests to the TikTok platform, which enables TikTok to identify visitors and track behavior with hyper-granular details.

45. The TikTok Pixel collects the visitor's IPv6 address. Web beacons are sent to TikTok servers to track visitor activity and enrich data using the visitor's IPv6 address. Additional data tracked includes the page URL viewed, device type, device IPv4 address, device user agent, event timestamp, page view unique ID, session unique ID, message event unique ID, and user tracking IDs.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT



46.    The TikTok _ttp tracking cookie is used to collect data about users for the purposes of delivering targeted interest-based advertisements. Below is a screenshot of the first-party and third-party cookie stored on the user's browser.

| Name | Value | Domain |
|------|-------|--------|
| _ttp | 01KFEDSCVV07NRK6R2XM2EFQ2C_.tt.1 | .shrineauditorium.com |
| _ttp | 38XDR1sfA9p47DpKCruvHV8ALJO | .tiktok.com |

### 3.    Facebook Pixel

47.    The Facebook Pixel collects detailed information about each pageview, including the page URL/referrer, device user-agent, screen dimensions, language settings, timing metrics, _fbp first-party cookie, and the event ID. This data is sent alongside technical metadata (user agent, platform, integration source) and is used to identify the visitor, track their activity across the site, and associate the visitor with a Facebook account when possible. Meta also automatically receives the visitor's IP

- 15 -

FIRST AMENDED COMPLAINT

address and logged-in Facebook identifiers/cookies server-side, enabling geolocation, identity matching, and cross-site behavioral profiling.



48.    Cookies are sent with the request. The c_user cookie stores the Facebook user ID, which can directly identify logged in user accounts. The datr cookie is used to identify a unique browser/device and can be used by Facebook to internally identify logged out users. The fr cookie is used for advertisement tracking and contains an encrypted version of the Facebook user ID which can directly identify users.

| Name | Value | Domain | |
|------|-------|--------|---|
| ar_debug | 1 | .facebook.com | / |
| c_user | | .facebook.com | / |
| datr | rG48aZPqWJe1vPmLdsGV_NcD | .facebook.com | / |
| fr | 1d1UAp0n4b1h4sEbp.AWcR3QAcCca32n... | .facebook.com | / |
| ps_l | 1 | .facebook.com | / |

- 16 -

49.     The Meta _fbp cookie is a Facebook identifier that is set by Facebook's source code which is stored as first party cookie data and able to track users over the next 90 days.

| Name | Value | Domain |
|------|-------|--------|
| _fbp | fb.1.1768937010284.535466697499079... | .shrineauditorium.com |

### 4.     TheTradeDesk

50.     The Trade Desk, Inc. is an American multinational technology company that specializes in real-time programmatic marketing automation technologies, products, and services, which are designed to personalize digital content delivery to users.

51.     The Website sends a request to The Trade Desk that identifies users and tracks their behavior across the Website. This data is used to build audiences for target advertising and marketing campaigns.

52.     As depicted in the screenshot image below, the data payload contains an advertising account ID.  The data payload also shows that cookie syncing is enabled. Finally, the data payload contains the referrer page URL. Subsequent requests to http://match.adsrvr.org/track/cmf/ are used to synchronize cookie data with third-party advertising platforms Magnite, Xandr, and Google.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 17 -



53. Third-party tracking cookies are stored on the browser.

| Name | Value | Domain |
|---|---|---|
| TDCPM | CAESFgoHcnViaWNvbhILCKCp8NTtmOw... | .adsrvr.org |
| TDID | c5a85b33-f3fb-4e4f-a6a2-495fb58ecd08 | .adsrvr.org |

### 5.    **Xandr**

54. Xandr is a Microsoft-owned data aggregation company that operates an online platform for buying and selling consumer data for digital advertising campaigns.

55. When a visitor accesses a website using Xandr, a request is sent to the Xandr tracking URL (adnxs.com), which allows Xandr to gather data about the user's device and location. The X-Proxy-Origin in the response header reveals the device's IP address, which identifies the geographic region from where the request originated.

56. The user IP address is in the X-Proxy-Origin response header and tracking cookies are stored on the user's browser.

57. The X-Proxy-Origin is an HTTP Header used to expose privacy-sensitive information by design. When a user connects directly to a server, the client's IP address

- 18 -

is sent to the server, but if a user connection passes through any forward or reverse proxies, the server only sees the final proxy's IP address.  By passing the original client's IP address in the X-Proxy-Origin header, the backend servers are able to identity and preserve the user's IP address.



### 6.   Google Ads Remarketing

58.   Google Ads remarketing, also known as retargeting, allows businesses to show advertisements to users who have previously visited their website or interacted with their mobile application.

59.   Web beacons are sent out to DoubleClick when visitors load a page on the website. These requests can identify the specific page view, the specific web session, the individual user, the type of device, which browser and what version, and the specific time the visitor viewed the page.

/ / /

/ / /

/ / /

/ / /

- 19 -



60.    Tracking is allowed to continue across multiple sessions by storing the IDE tracking cookie on the visitor's browser for 13 months.

| Name | Value | Domain | Pa |
|------|-------|--------|----|
| IDE | AHWqTUmxeMXvt4elkU4inp4ScHP8-Hky... | .doubleclick.net | / |

### 7.    **Amazon Product Ads**

61.    Amazon tracks pageview events, timestamps, and user identification values.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 20 -



62.    Third-party tracking cookies are stored on the browser.

| Name | Value | Domain |
|------|-------|--------|
| ad-id | A5SGL0DYMEzCiNzwl9sVpSs | .amazon-adsystem.com |

**C.    Browser Cookies Persist Even If a User Opts-Out of Non-Essential Cookies Via Either the Cookie Banner or the CMP.**

63.    When consumers visit the Website, Defendant displays to them a pop-up cookie consent banner containing a CMP on the homepage.    Although Defendant's cookie banner discloses that the Website uses cookies, it expressly purports to give users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "Reject All" cookies by clicking on the "Reject All" button.

64.    The cookie banner states as follows:

- 21 -

"We and certain third parties may use cookies or similar technologies to process data when you visit our sites. This data may relate to your use of our sites, your preferences, your device, or other information about you. We and third parties may use this information for a variety of purposes, such as enabling the sites to function, to personalize your experience when using our sites, to provide you with advertisements based on your interests, and for analytical purposes. **Privacy Policy**"

65. The left hand side of the cookie banner contains three buttons for a user to select from: (1) "Manage Cookie Preferences"; (2) "Reject All"; and (3) "Accept All".

66. A copy of the cookie banner is depicted in the screenshot image below:

67. After a user opts-out of non-essential cookies either via the cookie banner (by selecting the "Reject All" button) or the CMP (by toggling off "Targeted Advertising Cookies" and "Analytics Cookies"), the pre-consent spyware no longer fires on the Website. Although the spyware no longer tracks users on the Website itself, the third party cookies that were loaded before consent are not removed from the user's browser storage, which means that the spyware platforms are still able to track and identify users across other websites that also use the same spyware services that deployed the third party cookies onto the user's browser.

68. The screenshot below depicts such third party cookies that continue to remain on the user's browser:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 22 -

FIRST AMENDED COMPLAINT

69.    Defendant's pop-up cookie consent banner and CMP led Plaintiff, and all those similarly situated users of the Website, to believe that they declined or rejected all non-essential cookies and tracking technologies, especially those that share personal information with third parties, such as performance, targeting, and social media cookies. The banner and CMP further reasonably led Plaintiff and other Website users to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with *any* website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon either clicking the "Reject All" button from the cookie banner or selecting the toggle switches in the CMP to de-activate "Targeted Advertising Cookies" and "Analytics Cookies".    Defendant's representations, however, were misleading.    As mentioned above, the spyware

- 23 -

platforms are still able to track and identify users across other websites that also use the same services associated with the third party cookies downloaded onto the user's browser because of the Website.

70. Even when consumers like Plaintiff tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

**D.** **The Website Contains a Method Allowing for a Non-Essential Third Party Cookie to Bypass the CMP Banner.**

71. The Website uses the online form builder service Tally.so on the Website's "Contact Us" webpage at:   https://www.shrineauditorium.com/contact-us/ (last visited Feb. 6, 2026).  An iframe connection is opened to the tally.so website, which enables cookies to be stored on the user's browser and allows non-essential cookies to bypass the CMP banner.

72. A screenshot of the contact form embedded iframe is depicted below:

73. The cookies are stored by a request made to Google's reCAPTCHA service, which is designed to prevent fraudulent requests.  However, some of the cookies stored are not necessary for this purpose. One such cookie is the "__Secure-3PAPISID" cookie, which is used by Google to track user activity to build interest-based profiles in order to deliver "more relevant" advertisements to users.  In practice, this allows Google to sell audience data to advertisers seeking to deliver targeted advertisements to users they have no direct relationship to.

- 24 -

FIRST AMENDED COMPLAINT

74. The cookie name is: _Secure-3PAPISID, which is in the category of marketing/advertising. This cookie is used by Google to deliver more relevant advertisements to users. It builds a profile of the user's interests based on the user's browsing activity. The duration of this cookie is two years.

75. In summary, even if the user has rejected the use of third-party tracking and advertising cookies on the Website via either the cookie banner or the CMP, an embedded iframe bypasses privacy mechanisms and allows a persistent targeting cookie to be stored anyway.

**E.    The Private Communications Collected Are Valuable.**

76. The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users

- 25 -

FIRST AMENDED COMPLAINT

when they visit *other* websites, even those completely unrelated to Defendant and its products and services.

77.    Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the consumer electronics market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

78.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[1] Indeed, "[t]he monetary value of personal data is large and still growing, and  corporate America is moving quickly to profit from the trend."  *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

79.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell his data or the consumer's willingness to pay to protect his information.

80.    Through its false representations and aiding, agreeing with, employing, permitting,  or  otherwise  enabling  the  Third  Parties  to  track  users'  Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

---

[1] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

FIRST AMENDED COMPLAINT

## F.    Plaintiff's Experience

81.    In August 2025, Plaintiff visited the Website to browse information about the Website's products and services advertised on the Website.  Plaintiff was unaware of the secret spyware being used to surveil visitors and to monetize their personal information.    Plaintiff is both (1) genuinely interested in the products, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law.  The Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

82.    During Plaintiff's August 2025 visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website.

83.    When Plaintiff visited the Website on August 2025, the Website immediately presented her with Defendant's pop-up cookie consent banner.

84.    Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff rejected non-essential cookies via either the cookie consent banner or the CMP.  Plaintiff believed that selecting such option would allow her to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

85.    In selecting the option to reject such non-essential cookies via either the cookie banner via the "Reject All" button or the CMP via the toggle switches, Plaintiff gave Defendant notice that she did not consent to the use or placement of non-essential

- 27 -

cookies and tracking technologies while browsing the Website. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

86. Even before the pop-up cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for performance targeting, and social media functions, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the pop-up cookie consent banner's representation to Plaintiff that she could reject the use and/or placement of all non-essential cookies and tracking technologies while she browsed the Website was either false or misleading. Contrary to what Defendant made Plaintiff believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

87. Defendant's representations that consumers could "Reject All" cookies via the cookie banner or reject "Targeted Advertising Cookies" and "Analytics Cookies" via the CMP while Plaintiff and other users browsed the Website were either untrue or misleading because: (1) the third-party cookies were already downloaded onto Plaintiff's browser and operational immediately upon Website loading before Plaintiff even had an opportunity to review either the cookie banner or the CMP embedded therein; (2) the third-party cookies downloaded onto Plaintiff's browser would allow such third-party cookies to track Plaintiff's browsing of other websites; and (3) Plaintiff's computer expert has determined that the Website uses the online form builder service Tally.so on the Website's "Contact Us" webpage at: https://www.shrineauditorium.com/contact-us/ (last visited Feb. 5, 2026), which allows an iframe connection to be opened to the tally.so website, which enables cookies to be stored on the user's browser and allows non-essential cookies to bypass the CMP. Had Plaintiff known the foregoing facts, she would not have used the Website. Moreover, Plaintiff reviewed the pop-up cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies

- 28 -

to be stored on consumers' devices even after they choose to reject all non-essential cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

88.  Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject non-essential cookies and tracking technologies (so that such cookies would not be operational immediately upon website loading or stored on user browsers allowing third party cookies to track such users when visiting other websites that use the services of such third party cookies or allow the CMP to be bypassed via the Tally.so service), Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website.  Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

89.  Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces.  Only an injunction can remedy this threat of future harm.

FIRST AMENDED COMPLAINT

## V.   CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Federal Wiretap Act

### (Violation of 18 U.S.C. § 2511)

90.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

91.   The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception.  18 U.S.C. § 2511(1)(a) & (d).

92.   The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

93.   Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

94.   The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

95.   No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by misrepresenting the nature of the data collection and the identity of the third-party recipients.

96.   Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker (or other third party) to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on

- 30 -

Defendant's Website. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendant's facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

97.    Defendant intended to disclose its Website visitors' personally identifiable communications to Third Parties (and other third parties) so that it could deliver targeted advertisements to its customers despite its promise not to collect or use Private Communications for users who declined to allow the use of "Targeted Advertising Cookies" via either the cookie consent banner or the toggle switch in the CMP.

98.    Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of first party or third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

99.    As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the

- 31 -

greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

**SECOND CLAIM FOR RELIEF**

**California Invasion of Privacy Act**

**(Violation of Cal. Penal Code § 638.51)**

100. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

101. CIPA includes the following statement of purpose:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

102. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

103. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order…."

104. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

105. The Third Parties' (or other third parties') cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device"

- 32 -

because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

106. At all relevant times, Defendant caused the Third Parties' (and other third parties') cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

107. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

108. Plaintiff did not provide her prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff informed Defendant that she did not consent to the Website's use of third-party cookies by either clicking the "Reject All" button in the cookie consent banner or rejecting the use of "[t]argeted advertising cookies" and "[a]nalytics cookies" via the toggle switches in the CMP made available via the cookie consent banner.

109. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

110. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

111. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a)

- 33 -

FIRST AMENDED COMPLAINT

## THIRD CLAIM FOR RELIEF

### Intrusion Upon Seclusion

112. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

113. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

114. By permitting third-party cookies to be stored on consumers' devices, which enabled the Third Parties (and other third parties) to track and collect Plaintiff's Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the Website's pop-up cookie consent banner and CMP, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

115. The Third Parties' (and other third parties') tracking and collecting of Plaintiff's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties (and other third parties)—was not authorized by Plaintiff, and, in fact, Plaintiff specifically chose to either "Reject All" cookies via the cookie consent banner or decline to allow "Targeted Advertising Cookies" and "Analytics Cookies" via the CMP.

116. Plaintiff had an objectively reasonable expectation of privacy surrounding her Private Communications on the Website based on Defendant's promise that users could deny cookies other than "[e]ssential cookies" and "[f]unctional cookies", as well as state criminal and civil laws designed to protect individual privacy.

- 34 -

117. Defendant's intentional intrusion into Plaintiff's and other Website users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could allow only "[e]ssential cookies" and "[f]unctional cookies" when, in fact, Defendant caused such first party or third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such non-essential cookies. Indeed, Plaintiff reasonably expected, based on Defendant's false representations, that when she rejected all non-essential cookies and tracking technologies, Defendant would not cause such first-party or third-party cookies to be stored on her device or permit the Third Parties to obtain her Private Communications on the Website (or other websites), including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

118. Defendant's conduct was intentional and intruded on Plaintiff's Private Communications on the Website (or other websites).

119. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

120. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

121. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of

FIRST AMENDED COMPLAINT

cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. An award of actual and statutory statutory damages;

b. An order for full restitution;

c. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

d. An injunction permanently enjoining Defendant from continuing the unlawful conduct alleged in this Complaint;

e. For reasonable attorneys' fees and costs as allowed by law; and

f. For such further relief as a matter of law or equity as may be just and proper as determined by the Court.

Dated:  February 6, 2026          PACIFIC TRIAL ATTORNEYS, APC


By: _/s/ Scott J. Ferrell_
Scott J. Ferrell
Attorneys for Plaintiff

FIRST AMENDED COMPLAINT